UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE D. RIENZI, | ) | CASE NO. 4:12CV1424 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE GEORGE J. |
| | ) | LIMBERT |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | MEMORANDUM OPINION AND ORDER |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Christine D. Rienzi ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB").  ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed and Plaintiff's complaint is dismissed with prejudice:

## I.    PROCEDURAL AND FACTUAL HISTORY

On May 15, 2009, Plaintiff  applied for DIB and  and Supplemental Security Income ("SSI")[2], alleging disability beginning October 1, 2008. ECF Dkt. #12 ("Tr.") at 116-126.[3] Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012 ("DLI"). Tr. at 20. The SSA denied Plaintiff's DIB application initially and on reconsideration. Tr. at 63-68. Plaintiff requested an administrative hearing, and on January 12, 2011, an ALJ conducted an

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]Plaintiff's application for SSI was not addressed by the ALJ in her Decision, nor is it the subject of this appeal.

[3]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

administrative hearing, where Plaintiff testified and was represented by counsel.  Tr. at 36-62.  The ALJ also accepted the testimony of  Dr. William Reed, a vocational expert ("V.E.").   On January 25, 2011, the ALJ issued a Decision denying benefits. Tr. at 17-35. Plaintiff filed a request for review, which the Appeals Council denied on May 2, 2012.  Tr. at 1.

On June 6, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On November 17, 2012, Plaintiff filed a brief on the merits. ECF Dkt. #15. On December 28, 2012, Defendant filed a brief on the merits.  ECF Dkt. #16.  A reply brief was filed on January 9, 2013. ECF Dkt. #17.

**II**.      **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was forty-two years of age on the alleged onset date and forty-four years of age at the hearing, suffered from degenerative disc disease with a component of sciatica, a seizure disorder, a depressive disorder, and a generalized anxiety disorder, which qualified as severe impairments under 20 C.F.R. §404.1520(c). Tr. at 19.  The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525 and 404.1526 ("Listings").  Tr. at 21.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §404.1567(b), except that she is limited to occupations that require not more than occasional postural activities, such as balancing, stopping, kneeling, crouching, crawling, and climbing on ramps and stairs only, and must avoid climbing ropes, ladders or scaffolds.  She must have a sit/stand option; cannot be exposed to occupational hazards, such as dangerous machinery and unprotected heights, and limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, which requires no more than occasional interaction with members of the public, coworkers and supervisors.  Tr. at 23-24.

The ALJ ultimately concluded that, although Plaintiff could no longer perform her past work as a manager in a dental office and a vice president of a car care business, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of security guard, photocopy machine operator, and assembler of electric

accessories.  Tr. at 30. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

**III.**  **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**IV.**  **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V.  ANALYSIS

Plaintiff advances three arguments in this appeal. First, Plaintiff contends that the ALJ erred in discrediting the findings of the consultative examiner, state agency physicians, and treating physicians and substituting her own opinion on medical matters beyond her expertise. Second, Plaintiff asserts that the ALJ erred in concluding that her ability to perform sporadic activities of daily living indicates that she is capable of sustained gainful activity.  Finally, Plaintiff argues that the ALJ failed to meet the Step Five burden, that is, that Plaintiff is capable of performing other work.

Plaintiff began mental health treatment with psychiatrist Vincent Paolone, M.D., on January 17, 2008. Tr. at 271.  Plaintiff reported "a lot of stress" at work.  Tr. at 271.  At the time, she and her husband ran a mechanic shop/machine shop, and she was the only employee that worked in the office. She also reported difficulty sleeping, a reduced tolerance for stress, irritability, verbal outbursts, and "some marital discord." Tr. at 271. She admitted that she had been drinking at work and had not been to work in one week.  Plaintiff acknowledged that she "needs to find hobbies," and that "previously all activities [were with her husband.]" Tr. at 271. Dr. Paolone diagnosed generalized anxiety disorder and depression. He prescribed Lexapro, and Clonazepam, and instructed Plaintiff to stop drinking alcohol.

-4-

Plaintiff returned to Dr. Paolone on January 31, 2008.  Tr .at 272.  Plaintiff had not returned to work but reported that her sleep had improved and that she was doing some paperwork at home. At her February 18, 2008 appointment, Plaintiff reported that her husband told her that he "needed some space." Tr. at 272.  Plaintiff denied consuming alcohol but reported low self-esteem.  She did not suspect marital infidelity.  At her appointment on March 3, 2008, Plaintiff informed Dr. Paolone that her husband "wanted the books and indicated he didn't want her working in the business."  Tr. at 273.  Plaintiff further reported that her husband had been seen on five separate occasions with her hairdresser.  Plaintiff was sleeping poorly and reported crying spells.  Dr. Paolone increased Plaintiff's dosage of Clonazepam.

On March 17, 2008, Plaintiff reported that she had filed for divorce. Tr. at 274. She claimed that her husband had fired her, although they were business partners so she did not believe that he had the legal authority to terminate her employment.  She reported that she had a restraining order against her husband and that he was "running the business into the ground." Tr. at 274.  At her March 31, 2008 appointment, Plaintiff reported that her future ex-husband was becoming more abusive, but that she was not drinking alcohol and that she was "committed to moving on with her life." Tr. at 275.

On July 17, 2008, Plaintiff conceded that she had "a couple episodes of drinking" and she was arrested and charges with driving while intoxicated.  Tr. at 277.  At her August 21, 2008 appointment, Plaintiff reported ongoing problems with her future ex-husband and arguments with him about money.  Tr. at 278.  Dr. Paolone warned Plaintiff about the risks of alcohol and drug interaction.

Plaintiff saw Dr. Paolone regularly through 2010, until she was no longer able to afford treatment.  Tr. at 413.  Plaintiff continued to complain about the stresses of divorce, her future ex-husband's bankruptcy petition, and his boorish behavior. Tr. at 278-80, 413-14. On the other hand, Dr. Paolone's notes suggest some improvement in Plaintiff's mental health.  For example, Plaintiff reported that she had stopped drinking and was involved in a relationship with a new man. Tr. at 278-80, 413-14.

-5-

Plaintiff suffered a grand mal seizure on October 5, 2008. Tr. at 238-240. She presented to the emergency room and reported that she had not eaten that day, but for an energy drink. Tr. at 239. Nitin Patel, M.D., examined Plaintiff and diagnosed new onset of seizure disorder. Plaintiff was prescribed anti-convulsive medication and advised not to drive. Tr. at 238, 240, 313. Objective evidence, including an electroencephalograph and a magnetic resonance angiography/imaging ("MRI") of the brain revealed unremarkable findings. Tr. at 304, 318.

After this first and only grand mal seizure, Plaintiff sought treatment with Lara E. Jehi, M.D. at the Cleveland Clinic. Tr. at 249, 254. On October 29, 2008, Dr. Jehi reported that Plaintiff had "the shakes" three or four times since her grand mal seizure on October 5, 2008. Tr. at 250. A physical examination revealed findings within normal limits. Tr. at 251-52. Dr. Jehi concluded that Plaintiff's history is "suggestive for a diagnosis of a single convulsion." Tr. at 252. Dr. Jehi recommended a follow-up appointment in six months. Tr. at 257.

Six months later, Plaintiff reported to nurse practitioner Kim Merner that she experienced a seizure in late March 2009, which involved three episodes of dizziness and distorted vision without loss of awareness. Tr. at 260. At the time, Plaintiff conceded that she drove from time to time and reported feeling "lots of stress" as a result of being unemployed and going through a divorce. Tr. at 260. Plaintiff was scheduled for a return appointment "as needed." Tr. at 262.

On May 26, 2009, Plaintiff presented to Dr. Patel and denied any physical symptoms. Tr. at 285. Dr. Patel noted that Plaintiff "appeared healthy" and reported normal physical examination findings. Tr. at 285-86. Similarly, on June 22, 2009, Dr. Patel found unremarkable findings after a physical examination. Tr. at 283-84. Plaintiff complained of anxiety with depression, and "partial" seizures. Tr. at 283. Dr. Patel recommended that Plaintiff "follow up at the Cleveland Clinic" regarding her seizures. Despite normal findings on examination, Dr. Patel wrote that Plaintiff was "totally disabled, unable to drive." Tr. at 284. Plaintiff reported anxiety, joint pain, and seizures at her appointment with Dr. Patel on November 20, 2009. Tr. at 361. Physical examination again revealed normal findings, including ideal posture, full strength, and normal range of motion. Tr. at 361-62. Dr. Patel advised Plaintiff to return in six months. Tr. at 362.

On April 19, 2010, an MRI of Plaintiff's lumbar spine revealed L5-S1 spondylolisthesis with neuroforaminal impingement and possible right side radiculopathy. Tr. at 376. Plaintiff complained of low back pain to Dr. Patel on July 27, 2010 (Tr. 391). She reported no numbness or tingling. Tr. at 391. Physical examination revealed unremarkable findings, including normal range of motion, full strength, normal muscle tone, and no instability. Tr. at 392. Dr. Patel diagnosed Plaintiff with sciatica and recommended an epidural block. Tr. at 392. Plaintiff received three epidural injections between August 10, 2010 and September 7, 2010. Tr. at 380-82.

On August 14, 2009, Tonnie Hoyle, Psy.D., a state agency psychologist, reviewed the record and found the evidence established depressive disorder and anxiety disorder as severe impairments (Tr. 348). She determined that Plaintiff had only moderate limitations in concentration, persistence or pace, and social functioning, and only mild limitations in activities of daily living. Tr. at 348. Dr. Hoyle opined that Plaintiff had moderate limitations in her abilities to complete a normal workday without interruptions, to interact with the public, to accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to changes in the work setting. Tr. at 345-46. She concluded that Plaintiff is able to understand and remember simple, one to two-step instructions, able to maintain attention sufficiently to complete simple, one to two-step tasks, able to get along with co-workers and supervisors in at least a superficial manner, and able to adjust to ordinary stress and routine change in the workplace. Tr. at 337. On February 5, 2010, Kristen Haskins, Psy.D., another state agency psychologist, affirmed Dr. Hoyle's findings. Tr. at 371.

On August 22, 2009, Esberdado Villanueva, M.D., a state agency medical consultant, reviewed the medical evidence and noted that Plaintiff "does have a seizure disorder, but her seizures are not so frequent or severe as to meet listings." Tr. at 357. Dr. Villanueva opined that Plaintiff could perform work at all exertional levels but should never climb ladders, ropes, or scaffolds, and should avoid all exposure to hazards. Tr. at 354, 356. On March 5, 2010, with the benefit of an updated medical record, a second state agency medical consultant, Walter Holbrook, M.D., affirmed Dr. Villanueva's opinion after noting that the medical evidence did not show any changes or new conditions. Tr. at 372.

-7-

In connection with her application, Plaintiff underwent a consultative examination with J. Joseph Konieczny, Ph.D., on July 29, 2009. Tr. at 329. Plaintiff reported that she has a good relationship with her family and graduated from high school and attended some college. Tr. at 329. When asked why did she stop working in January 2007, Plaintiff responded by stating, "My husband let me go, and I've been depressed." Tr. at 330. A mental status examination revealed Plaintiff as distressed and anxious but exhibiting clear, coherent speech, good hygiene, and appropriate eye contact. Tr. at 330-31. Dr. Konieczny described Plaintiff as oriented with no suicidal thoughts or hallucinations. Tr. at 331. Dr. Konieczny also found Plaintiff's ability to concentrate and to attend to tasks unimpaired because Plaintiff exhibited good recall memory. Tr. at 331. During the examination, Plaintiff reported extensive activities of daily living, including cooking, cleaning, doing laundry, shopping, managing finances, and regularly attending church. Tr. at 331-32. Dr. Konieczny diagnosed Plaintiff with depressive disorder and anxiety disorder after assessing Plaintiff with a Global Assessment of Functioning ("GAF") rating of 50.[4]  Tr. at 332. Dr. Konieczny concluded that Plaintiff's ability to concentrate and to attend to tasks showed no indications of impairment, but Plaintiff's ability to withstand stress and pressure was markedly impaired. Tr. at 332. Dr. Konieczny further opined that Plaintiff's abilities to relate with others and to deal with the general public were moderately impaired. Tr. at 332.

Plaintiff's treating psychiatrist provided a medical source statement dated January 11, 2010 Tr. at 366. Dr. Paolone opined that Plaintiff has limited ability to remember and understand directions, had poor abilities to maintain attention, sustain concentration, persist at tasks, complete them in a timely fashion, and react to pressures involved in simple and routine, or repetitive tasks Tr. at 367. Additionally, Dr. Paolone noted that Plaintiff was avoidant in her social interaction. Tr. at 367. Despite these limitations, Dr. Paolone also opined that Plaintiff would be capable of managing her own benefits. Tr. at 367.  Plaintiff's treating physician, Dr. Patel, provided a medical

---

[4]A GAF score of forty-one to fifty indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job, cannot work).

source statement dated October 1, 2010. Tr. at 390. Dr. Patel stated that Plaintiff's seizures were uncontrolled and she was unable to work or drive. Tr. at 390.

Although Plaintiff did not have another grand mal seizure since her first incident in October of 2008, she testified at the hearing that she experienced "mini seizures" a couple times a month. Tr. at 46-47. She testified that she had one seizure in the month before the hearing. Tr. at 47. She explained that she gets dizzy and lightheaded during these events. Tr. at 46.

Plaintiff also described her back pain as constant on her right side. Tr. at 48-49. She noted that she cannot sit or stand for a long period of time. Tr. at 49. She added that bending also causes pain. Tr. at 50. However, Plaintiff acknowledged that having the option to sit and stand would help alleviate pain. Tr. at 50.

At the hearing, Plaintiff testified that she was prescribed Trileptal, a seizure medication, and that she was instructed to take Naproxen for back pain as needed. She explained that she did not take Naproxen because it does not alleviate her pain and it causes nausea. Tr. at 44.

Concerning her mental health, Plaintiff testified that she stopped seeing her psychiatrist because of a lack of money. Tr. at 44. She testified that she cries a couple of times a day. Tr. at 51. She reported experiencing panic attacks "[j]ust once in a while." Tr. at 51.

The ALJ asked the VE to consider an individual with Plaintiff's education and work experience, with the following limitations: a range of light exertion that allows for no more than occasional performance of postural activities, such as balancing, stooping, kneeling, crouching, and crawling; occasional climbing on ramps and stairs, no climbing ropes, ladders, or scaffolds; a sit/stand option; no exposure to occupational hazards, such as dangerous machinery and unprotected heights; simple, routine, repetitive tasks not performed in a fast-paced production environment, and no more than occasional interaction with members of the public, co-workers, and supervisors. Tr. at 53-54. The VE testified that such an individual could not perform Plaintiff's past jobs. Tr. at 54.

The VE then considered job possibilities in the national economy for such an individual. Tr. at 54. He stated that a job as a security guard would accommodate such restrictions, and that there are 100,000 such positions in the national economy. Tr. at 54. The VE explained that although the Dictionary of Occupational Titles ("DOT") lists this occupation with a maximum specific vocational

-9-

preparation ("SVP") level of 3, it is considered unskilled Tr. at 54. The VE also testified that jobs as a photocopying machine operator and as an electrical accessories assembler would accommodate those same restrictions, and that there are 300,000 such jobs in the national economy. Tr. at 55. These occupations require a SVP level of 2. Tr. at 55. The VE testified that all three jobs have a maximum general educational development ("GED") reasoning level of 2 or 3 according to the DOT.  Tr. at 58-59.

Turning to Plaintiff's first argument, she contends that the ALJ erred  in discrediting the findings of the consultative examiner, state agency physicians, and treating physicians.  Plaintiff further contends that the ALJ erred in substituting her own opinion on medical matters beyond her expertise.

First, it is important to note that the state agency physicians concluded that Plaintiff was capable of full-time employment. Consequently, the ALJ's  decision regarding disability is not at odds with the opinions of the agency physicians. Although the agency physicians recognized certain mental and physical limitations that would affect Plaintiff's ability to perform gainful employment, all of them agreed that she was capable of work.  The ALJ wrote that she gave "great weight to the consultative opinions in Exhibits 7-F (Dr. Hoyle), 8-F (Dr. Hoyle), and 9-F (Dr. Villanueva), since these claims are consistent with other medical evidence of record." Tr. at 27.  The ALJ did not provide any specific citations to the record to support the weight accorded to the agency physicians.

Plaintiff correctly argues that Dr. Konieczny, the consulting physician, concluded that she was markedly limited in her ability to handle work pressures.  Similarly, Dr. Paolone opined that Plaintiff has limited ability to remember and understand directions, has poor abilities to maintain attention, sustain concentration, persist at tasks, complete them in a timely fashion, and react to pressures involved in simple and routine, or repetitive tasks Tr. at 367. Likewise, Dr. Patel opined that Plaintiff's seizures are uncontrolled and she is unable to work or drive. Tr. at 390.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544.   A presumption exists that the opinion

-10-

of a treating physician is entitled to great deference.  *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007).  If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.  *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  *Id.* citing  20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict

the opinion" may be considered in assessing any type of medical opinion.  *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors."  The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion."  *Gayheart* at 377.

Here, the ALJ wrote that she gave "great weight to the clinical data of [Plaintiff's] treating physicians."  Tr. at 27.  She nonetheless concluded that '[t]he severity of symptoms of the clinical data from these providers did not reflect the severity of symptoms that would be disabling."  Tr. at 27.  The ALJ continued, "Although [Plaintiff] has certain mental limitations, I have interpreted the clinical findings of record as showing that [Plaintiff's] symptoms were not of such severity to preclude her from working at a job within the [RFC] as determined.  Tr. at 27.

With respect to Dr. Konieczny, the ALJ gave "little weight" to Dr. Konieczny's conclusion that Plaintiff was markedly limited in her ability to deal with work pressures but moderately limited in her ability to deal with coworkers, supervisors, and the public.  Tr. at 27.  The ALJ wrote:

> [Dr. Konieczny's report] is based on [Plaintiff's] new onset of seizures and her mental health issues that have all seemed to have occurred nearly simultaneously. [Plaintiff] has a long and successful work history and to assume that her current condition will prevent her from working in the future is inconsistent with the other evidence in the record. . .Many of the limitations are reportedly based on [Plaintiff's] subjective statements to the consultative examiner and any limits she has in this area are covered by the within RFC.

Tr. at 27.

With respect to the opinions of Drs. Paolone and Patel, the ALJ wrote:

> I also considered the opinion of Dr. Paolone in Exhibit 11-F, who opined that [Plaintiff] would be poor at activity related to work.  The record of Dr. Paolone's clinical data does not support his opinion. Dr. Paolone's records show that [Plaintiff] was doing reasonably well on prescriptive Trileptal.  She was exercising and spending time with her boyfriend.  Her major stressors were those of her domestic and occupational problems.  Her seizures were under reasonable control and her back condition was being treated.

-12-

> I also considered the opinion of Dr. Patel in Exhibit 17-F, who opined that [Plaintiff] would be unable to work or drive secondary to seizure activity. [Plaintiff] continues to retain her drivers' licence.  This opinion is conclusory and not supported by the record.  Dr. Patel's records show that [Plaintiff's] seizures were under reasonable control and that much of his treatment was for her orthopedic condition.

Tr. at 28.

> The ALJ summarized the evidence in the record as follows:

> [Plaintiff] is able to care for her personal needs and is reasonably able to function to the degree that she can perform activities of daily living at a much higher level of functioning than [Plaintiff] has alleged.  She was vague in terms of how often she has seizures.  Further, she retains her driver's license.  She sees few physicians, does not have a primary care physician, and does not receive therapy.  She takes only one prescribed medicine and had only one grand mal seizure in her history.

Tr. at 28.

Based upon the foregoing excerpts from the ALJ's decision, it is clear that the ALJ gave great weight to the diagnostic testing results and medical notes of Plaintiff's treating physicians, but he gave little weight to their conclusions based on a lack of objective medical evidence in the record supporting those conclusions.  Having reviewed the medical evidence in the record, the ALJ did not err in rejecting the conclusion that Plaintiff could not work.  "The determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).  Here, the ALJ considered the benign findings in the medical records, as well as Plaintiff's conservative treatment, and found that the treating physicians' conclusions regarding her ability to work were not warranted.  The ALJ correctly observed that Plaintiff's ongoing seizure activity is predicated upon her subjective statements rather than any medical evidence in the record.  Plaintiff currently take a single anti-seizure medication and undergoes no ongoing treatment or therapy for her back pain.  Finally, Plaintiff's emotional problems were predicated largely upon her relationship with her ex-husband.  Simply stated, the medical evidence in this case does not support the extreme limitations articulated by Plaintiff's treating physicians and the ALJ did not err in giving little weight to those opinions, nor did she fail to articulate her reasons for giving little weight to those

-13-

opinions.     Next, Plaintiff contends that the ALJ erred in interpreting her limited ability to perform household chores as evidence of her ability to perform gainful employment.  As previously stated, the medical evidence in this case does not establish limitations of a degree consistent with Plaintiff's claims.  At the hearing, Plaintiff conceded that she does her own housekeeping, cared for her dogs, and prepared meals. Tr. at 24, 41-43. As a consequence, the ALJ did not err in relying upon Plaintiff's ability to perform many household tasks as additional evidence of her ability to perform gainful employment.

Finally, Plaintiff argues that the ALJ did not carry his burden of proof at Step Five of the analysis to demonstrate that Plaintiff can perform other work.     Plaintiff argues that the representative occupations identified by the VE had a SVP level of three, and a GED reasoning level of two or three, and that those occupations are inconsistent with the ALJ's finding that Plaintiff is limited to simple, routine, and repetitive tasks.

The SVP level refers to the DOT's listing of the time necessary to train for each described occupation. SSR No. 00–4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin. December 4, 2000). Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1 or 2.  *Id.*  Here, the VE testified that each of the representative occupations had an SVP level of 2.

Furthermore, the Sixth Circuit recently observed that "[w]hile the Commissioner 'will take administrative notice of reliable job information available from ... [the] Dictionary of Occupational Titles,' 20 C.F.R. § 404.1566(d), 'the Social Security regulations do not obligate [the ALJ and consulting vocational experts] to rely on the Dictionary's classifications.' " *Monateri v. Commissioner of Social Sec.*, 436 Fed. Appx. 434, 446 (6th Cir.2011) quoting *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir.2003).  The *Monateri* Court concluded that "neither the Commissioner nor the VE has an obligation to employ the DOT, and there is no precedent that requires the Commissioner to align DOT 'reasoning levels' with RFC classifications."  *Id.*  Accordingly, Plaintiff's final argument has no merit.

-14-

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.


DATE: September 18, 2013

                                                    */s/George J. Limbert*
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE